# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
January 6, 2016 Session

## ESTATE OF GEORGE LAMBERT v. JOHN ARNOLD FITZGERALD

**Appeal from the Chancery Court for Rhea County**
**No. 13-CV-10797     W. Jeffrey Hollingsworth, Judge Sitting By Interchange**

---

**No. E2015-00905-COA-R3-CV – Filed April 28, 2016**

---

George Lambert ("Lambert") sued John Arnold Fitzgerald ("Fitzgerald") in connection with money that Lambert gave to Fitzgerald to invest alleging claims for, among other things, fraud, intentional misrepresentation, violation of the Tennessee Securities Act of 1980, and unjust enrichment.  After trial and a hearing on a motion to amend, the Chancery Court for Rhea County ("the Trial Court") entered its order awarding Lambert a judgment against Fitzgerald for $33,840.28 in principal, pre-judgment interest, and attorney's fees pursuant to a promissory note, and dismissing Lambert's remaining claims.  Lambert appeals to this Court raising issues with regard to the dismissal of his claims for fraud, intentional misrepresentation, violation of the Tennessee Securities Act of 1980, and unjust enrichment.  We find and hold that Lambert failed to prove an essential element of his claims for fraud, intentional misrepresentation, and violation of the Tennessee Securities Act of 1980, and we affirm the Trial Court's judgment, in part, as to those claims.  We further find and hold that Lambert did prove his claim against Fitzgerald for unjust enrichment in the amount of $556,567.24, and we reverse the Trial Court's judgment with regard to this claim and remand this case to the Trial Court for entry of an additional award to Lambert from Fitzgerald of $556,567.24 for unjust enrichment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed, in part; Reversed, in part; Case Remanded**

D. MICHAEL SWINEY, CHIEF JUDGE, delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Hoyt O. Samples, Chattanooga, Tennessee, for the appellant, Kelly Lambert, Executor of the Estate of George Lambert.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellee, John Arnold Fitzgerald.

# OPINION

## Background

The evidence presented at trial can only be described as astonishing. This makes it necessary that we first discuss the evidence in detail.

Fitzgerald and Lambert knew each other for more than forty years.[1] Fitzgerald, who is an attorney in Dayton, Tennessee, had done legal work for Lambert in the past, and the two considered themselves to be friends. At some point during 2011, Lambert gave Fitzgerald money to invest with Donald Brindley ("the Investment"). Purportedly, the Investment involved containers of $150 million dollars in United States currency in cash that had been transported from South Africa to London, England where it was to be cleaned of some sort of ink or dye before it could be distributed to Brindley and ultimately to Brindley's investors. Brindley, who resided in California, was to obtain certain paperwork including a diplomatic license, powers of attorney, and an anti-terrorism certificate before the money could be moved from customs to a bank, cleaned, and ultimately distributed. Lambert was promised a return of $25 million for his investment of several hundred thousand dollars. As of the time of trial in August of 2014, neither Lambert nor Fitzgerald had received any return from the Investment. Lambert filed suit against Fitzgerald in August of 2013 and the case proceeded to trial without a jury in August of 2014.

Fitzgerald testified at trial that he has been a practicing attorney since 1973. He stated that he had known Lambert since before Fitzgerald went to law school, which was more than 44 years ago. Fitzgerald did legal work for Lambert's rock business. Fitzgerald testified that Lambert had been a client and that Fitzgerald considered him a friend.

Fitzgerald testified that he invested his own money in the Investment. He stated that he sent "a minimum of $517,000. I know I invested 517,000," but admited he does not have a single record supporting this assertion. Fitzgerald testified that he first sent money to Brindley in 2008. Brindley told him there was "$150 million worth of hundred dollar bills in United States currency" that came from South Africa and had been transferred to the mint. Brindley wanted money from Fitzgerald. When asked what that money was for, Fitzgerald stated:

---

[1] Lambert died after trial but before this appeal was filed. The Trial Court entered an order substituting the Estate of George Lambert for Lambert in this case. Kelly Lambert is the executor of the Estate of George Lambert.

Well, he went through all this list of things that cost a lot of money, like the anti terrorism certificate, the fact that he had to pay money for a power of attorney to be properly approved; and that he had to - - it cost maybe over $100,000 for him to be able to register for a diplomat and he needed to be a diplomat for him to make the diplomatic transfer from the mint.

He just had a lot of fees for a lot of things and lot of government costs. The government was taxing this and taxing this, and if it was $150 million, it was this much money. He just had a whole list of things that cost money. Every time I put up some money, he told me how much he'd pay me.

Fitzgerald produced a Form 1099-R at trial showing that he took a gross distribution of $90,000 from Tennessee Farmers Life Insurance Company in 2012. He also produced a Form 1099-R showing that he took $100,025 in proceeds from an insurance policy from Tennessee Farmers Life Insurance Company in 2011. Fitzgerald testified he gave all of this money to Brindley. He also testified that he cashed in a certificate of deposit of about $48,000 at Community National Bank, and that he gave this money to Brindley. Fitzgerald was asked if he had produced memos that show that he invested over $265,600 before Lambert became involved in the Investment, and he stated: "That would be correct, yes, sir." Fitzgerald testified that there were other investments for which he did not have a memo. Fitzgerald insisted that he himself "sent at least $517,000 of [his own] money." Fitzgerald admitted that he did not put his own money into the Investment after February of 2011.

When asked about the six containers in London, England each worth $25 million, Fitzgerald stated: "I still believe it. I still think the money is there." Fitzgerald was asked why the money had to be cleaned, and he stated:

It is my understanding that once that money was put into the international trade that it was - - that it had to have some type of what has been described as ink put on it. So it had to be cleaned when it got to the final destination where they could put it in the bank.

When asked what ultimately he was to get out of the deal, Fitzgerald stated: "I was supposed to get 25 million and George Lambert was supposed to get 25 million or more." Fitzgerald testified that when he first invested his own money, Lambert was not involved. Fitzgerald stated:

Well, to start with I was close to my 25- before George ever got in and may have been right at my 25-. . . . Well, but I remember one time him saying it

3

was for George Lambert and me, it was 50 million or 50 million plus. It looked like George and I would get - - yes.

Fitzgerald stated: "I do know that from keeping a mental calculation over the time, that I'm supposed to get $25 million out of it." He admitted, however, that he has no written record to show his expected rate of return. Fitzgerald stated: "I expected George Lambert to get 25 million too. Wasn't a one-way street. I think that George Lambert was to get 25 million from Donald Brindley and I was too."

When asked if he had received any money from the Investment, Fitzgerald stated:

No, but I believe if the lawsuit hadn't been filed it would have been over with because they were close to having all the money raised they needed to raise to pay everybody. It's my understanding that the six containers are right now sitting in HSBC Bank in London.

I think at some point in time if we can ever get this over with before the government confiscates it or before we can't pay what's got to be paid by Mr. Brindley right now on some receipts he's got held and different things that's got to be done; I think the 150 million is there.

I think I could still get my 25- and I hope George Lambert could. However, he's chosen not to pursue that at this point. I still think I'll get my 25-.

Fitzgerald admitted that for his claimed investment of $517,000:

My return has been zero. When you say how much have I invested, I've really invested - - that's so far what I have put into what I considered was determined to be the trade program. I have paid for Andy Tucker to stay in London all the time he stayed there. I paid for all his tickets to deliver cash.

Fitzgerald testified that he made payments to Brindley by cash or wire transfer only. The cash was hand-delivered. Fitzgerald kept the money in a lockbox that he could access until it was time to send a courrier. When asked if he could have taken the money out of the lockbox at any time, Fitzgerald stated: "That's right. I think the people are trusting me or they wouldn't have brought me the money." Fitzgerald sent cash "whenever it appeared that we were going to get something closed and we needed some money . . .."

4

Fitzgerald testified that his nephew, Andrew Tucker ("Tucker"), who is an attorney in Dayton, Tennessee, delivered money to Brindley from Fitzgerald. Fitzgerald stated: "Knoxville, Tennessee, is the only place I ever met Donald Brindley. Met him up there a couple of times. I don't believe it was but two. Andy Tucker took most of the money to him." Fitzgerald would send Tucker to London, England or Houston, Texas to deliver money. Tucker also invested money in the Investment. Fitzgerald admitted that Tucker never has received a return on his investment.

Fitzgerald admitted that he put attorney Howard Upchurch ("Upchurch") in touch with Brindley and that Upchurch also invested. To Fitzgerald's knowledge Upchurch never has received a return on his investment. Fitzgerald also admitted that he paid Justin Angel ("Angel"), an attorney in Upchurch's firm, to fly to Chicago to deliver some money to Brindley. Fitzgerald stated that he gave Angel a "bunch of money," but he could not recall how much. Fitzgerald admitted that he met Brindley twice in Knoxville, that Angel went to Chicago, and that Tucker went to Houston or London with money.

When asked how they were supposed to be paid the promised returns, Fitzgerald stated: "Supposed to be receiving it through the trust account. Supposed to be wired from London to my trust account. Then I could get the check to George."

Fitzgerald admitted he never asked for a contract or guarantee. He stated:

I did not because Mr. Mallory Horne, who was the president of the senate - - that's the terminology they use in the state of Florida I understand - - and former speaker of the house in the state of Florida told me that Donald Brindley was a good trader that could be trusted and you could make a lot of money dealing with him.

And another man who I'd dealt with in the past on some other deals, named Sam Jones from North Georgia. Both of those people told me Brindley was a good man. They both recommended him and said you could make a lot of money dealing with him.

Fitzgerald admitted, however, that he never met Mallory Horne and that Horne was not a personal friend of his. Fitzgerald stated that he spoke with Horne on the telephone. Fitzgerald admitted he never contacted anyone in the United Kingdom to find out if Brindley was telling him the truth.

Fitzgerald admitted he filed a third-party complaint against Brindley and that his complaint alleges that not a single representation made by Brindley has been correct. When asked if he believed what was in his third-party complaint, Fitzgerald stated: "I

also believe that money is still over there, and I'd like to have my $25 million." Fitzgerald was asked if any promise made by Brindley since 2008 had been fulfilled, and he stated: "It's not, but I have seen some letterheads, supposedly bank letterheads that said the money is all there. I still would like to get my $25 million."

Fitzgerald testified that he spoke with Brindley the day before Fitzgerald testified at trial. When asked if he was talking to a man against whom he had filed a third-party complaint, Fitzgerald stated: "Yes, sir. I think if I cut off conversation with him, I would have no idea what's going on over there. If eventually I don't get my money, I may have to go to England to see if I can get my money otherwise. I'll just have to see."

Fitzgerald admitted that within one year of giving his deposition in this case he met Brindley at the Knoxville Airport and gave Brindley cash, but he could not recall how much cash. Fitzgerald could not even estimate how much cash he had given to Brindley on that occasion.

When asked why he continued to give money to Brindley when he was not getting what was promised, Fitzgerald stated: "I still think the money is in those containers, and I think I could go to London and have my own private action and sue over those containers, to get my money out of those containers." When asked if he had hired an attorney, Fitzgerald stated: "No, I haven't yet. I can't spend any money to do that at this point in time. I believe the restraining order you've got against me would keep me from doing that."

Fitzgerald testified that when he sent money to Brindley, he would identify who the money came from "orally." He stated: "Nobody gave me money. I have not invested a penny. I have not taken an investment." Fitzgerald admitted, however, that he delievered money to Brindley and that money went through his trust account for this purpose. Fitzgerald stated: "I deposited some checks, and we turned it to cash where it could be delivered to him, yes, we did. That's correct."

Fitzgerald claimed he had sent over $200,000 in wire transfers over the years to Brindley. When asked if the money being wired from his trust account was his money, Fitzgerald stated: "No, it wasn't. I was sending out money that was being invested. There wasn't much of it wired. There was some of it wired, but not a big part of it." When asked if the money he wired was for the investment or for expenses, Fitzgerald stated:

> It was part of the investment. He said to make the investment pay off, he had to have such as different powers of attorney that cost substantial amounts of money in the United Kingdom, and that he had to be approved

6

over there in a different capacity than just an individual to be able to ride in the different armored trucks where they had carried the money.

He had a whole list of a number of expenses, but it wasn't for him to go spend. It was related to this deal.

When asked if during the time he was making investments Lambert was a client of his, Fitzgerald stated: "That's correct." Fitzgerald later was asked the same question, and he stated: "I believe that the only thing that was being done at the time was might have been doing some deeds." Fitzgerald testified that the Investment had nothing to do with any such deeds. When asked if the Investment had anything to do with legal services, Fitzgerald stated: "No, nothing at all. In fact, I didn't even mention it to Mr. Lambert. He asked me. He saw that and asked me."

Fitzgerald claimed that Lambert became involved in the Investment when Lambert was at Fitzgerald's office one day for a lunch meeting. Fitzgerald stated:

Then there was a document there that came from Donald Brindley, one of those memos that said how much money he was - - just a short one, how much money he'd pay for so many dollars. George Lambert saw it lying there, and George Lambert said to me, can I get this. . . . I thought he meant can I make this payment to invest this money with Brindley. So I said, George, we'll talk to Brindley and see. We called Brindley on the phone from my office. I have a speaker phone everywhere I have a phone in my office.

Fitzgerald stated: "I did not ask George Lambert to get involved in this. He said, can I get this." Lambert brought money to Fitzgerald, part in cash and part in checks that they cashed, and Fitzgerald gave the money to Tucker to carry to Brindley. Fitzgerald testified that this occurred in 2011. The next payment made by Lambert toward the Investment was in August of 2012.

Fitzgerald testified that as far as he knows no payment ever was made to Lambert. He stated: "George Lambert just said after he got started, he said don't let this die. He said, I'm going to put some more money in this; we'll make this go; how much money could I get out of it. That's when we worked up to him getting $25 million."

Fitzgerald claimed that he gave Lambert a copy of everything Brindley sent and stated: "I don't know if he took it home with him or not. I made it available for him. I didn't always check to see if he left it lying there." Fitzgerald claimed Lambert would frequently just leave the copies of things given to him lying on the table when he left

Fitzgerald's office. Fitzgerald testified that he gave Brindley's phone number to Lambert and that Lambert told him that Lambert and Brindley had conversations in which Fitzgerald was not involved.

Fitzgerald testified that all memos concerning the Investment were written by Brindley, Suzan Windrop, or others. He stated: "I have never written a memo since this started period, none, no to nobody." When asked how much extra he received for getting Lambert involved, Fitzgerald stated: "I didn't get any of Mr. Lambert's money. Mr. Lambert was just helping it to close. I didn't get extra because of Mr. Lambert." Fitzgerald claimed he was paid nothing and offered nothing to get Lambert involved in the Investment.

Fitzgerald denied ever keeping any of Lambert's money. He claimed he discussed with Lambert how much money Fitzgerald personally had put into the Investment. When asked if he kept Lambert updated, Fitzgerald stated:

> I did because Mr. Lambert a lot of times called me every day. . . . One of the main things he would say was don't let this thing fall through; if I've got to put more money up, I'll just put it up. He would volunteer. I wouldn't ask him to put it up. He would just say don't let this fall through; if I've got to put up more money, I will. But now, I never sent these memos out to anybody that it wasn't intended for it.

Fitzgerald was questioned about documents that Brindley sent him, and he stated that Brindley sent them either by fax or email. Fitzgerald referred to these documents as memos. A memo from Brindley to Fitzgerald dated May 29, 2008 stated that Fitzgerald was to wire $30,000 dollars to Brindley, and if the transaction closed, Brindley would "immediately (within 24 hours of receipt) wire to [Fitzgerald] the sum of $90,000.00" Fitzgerald admitted that he never received the $90,000. Fitzgerald admitted that he never had made any investment for which he received three times the investment within five days.

A memo from Brindley to Fitzgerald dated July 24, 2009 stated that Fitzgerald would receive $502,500 "on or before August 6, 2009" if he forwarded $5,000. Fitzgerald admitted that did not happen. Fitzgerald was asked if it caused him concern when he did not receive the $502,500, and he stated: "No. I thought that it still looked like a good deal, just like today I think it looks like a good deal. I think I'll still get my money because I believe it's there."

A memo from Brindley to Fitzgerald dated October 4, 2009 stated that Fitzgerald would receive $1,502,500 dollars if he wired $55,000 to Brindley, and that the transfer to

Fitzgerald would take place on or before October 22, 2009. Fitzgerald admitted he never received this money. A memo from Brindley dated October 20, 2009 stated that Fitzgerald previously had provided $18,000 and if he provided another $12,000 he would receive $300,000, with closing to occur within thirty days. Fitzgerald admitted he never received this money. A memo from Brindley to Fitzgerald dated November 8, 2009 stated that as consideration for providing the $30,000 and previous financial assistance Fitzgerald would receive a total of $3,502,500. Fitzgerald admitted he never got this money.

A memo from Brindley to Fitzgerald dated December 14, 2009 stated that another $70,000 was needed before December 23rd to remove the money from the storage vault, and stated there would be no more additional costs or restrictions. Fitzgerald was asked if there were any more restrictions after that date, and he stated: "I'm told things were changed in London for him to be put in - - he said he didn't know about them, but there were changes made and there were restrictions put in." Fitzgerald admitted that there were additional restrictions and additional costs. The memo also stated that for the $70,000 and other financial assistance Fitzgerald would receive $6 million dollars. Fitzgerald admitted that he never received this money.

A memo from Brindley to Tucker dated December 16, 2009 stated that Brindley needed to raise $75,000 in order to complete the project and that if Tucker could get the $75,000 he would receive $350,000 in return. This memo also stated that the transaction would be completed within the next thirty days. The December 16, 2009 memo also stated: "This is a legitimate financial transaction and is so stated under the penalty of perjury." Fitzgerald testified that to his knowledge Tucker never received this money.

A memo from Brindley to Fitzgerald dated January 7, 2010 requested $17,000 "to enable us to finalize, close and be paid . . . ," and stated that there are no other costs or regulations that could cause delay. Fitzgerald admitted this was not true. The memo promised $200,000 within 14 business days in return for the $17,000. Fitzgerald admitted he never received this money.

A memo from Brindley to Fitzgerald dated February 18, 2010 stated that Brindley's "Beneficiary Card was a temporary instead of a permanent one." Fitzgerald was asked what a beneficiary card was, and he stated: "I do not know." When asked what investigations he undertook to learn what a beneficary card was, Fitzgerald stated:

> Mr. Brindley just said you have to have a beneficiary card. He said he had
> to get one. . . . Because he was the diplomat that had been recommended to
> me by people who in the past had been very competent in dealing. So when
> they told me he was a good fellow to deal with, I thought he was.

9

Fitzgerald testified that Brindley was a diplomat for the United Kingdom and that he had seen Brindley's diplomatic credentials. A memo from Brindley dated March 19, 2010 stated that Brindley had to get a permanent beneficiary card signed by the United Nations Secretary General. Fitzgerald admitted he did not investigate to see if this claim was true. Fitzgerald never contacted the vault storage facility referred to in the memo.

A memo from Brindley to Fitzgerald dated April 2, 2010 promised $380,000 "within 48 to 72 hours of the actual deposit of the closing funds into the distribution account" in return for $38,000. Fitzgerald admitted he never received this money. A memo dated February 13, 2011 from Brindley to Fitzgerald stated that the $6,000 Fitzgerald was to provide, and the $28,000 previously provided, would be repaid within fourteen days. Fitzgerald admitted that never happened.

A business card of Fitzgerald's was introduced as an exhibit at trial. Upon the back of this business card, Fitzgerald gave Lambert a 'receipt' for $50,000. Fitzgerald received the $50,000 in cash. Fitzgerald admitted that the $50,000 was for the Investment.

A memo from Brindley dated May 9, 2012 stated that Brindley knew of nothing that would prevent the deal from closing and the sending of wire transfers the week of May 14, 2012. Fitzgerald admitted that did not happen.

A memo from Brindley dated June 14, 2012 showed a schedule for release of the funds expected during June and July of 2012. Fitzgerald testified that this memo was not sent to him, but he did get a copy of it. When asked to whose email address this memo was sent, Fitzgerald stated: "Somehow when things wouldn't come to me, they would go over to my son's house. I don't know. Evidently my machine wasn't operating that day or something. I don't know why it went over there. I don't remember why it went over there." The memo stated that Brindley would wire funds to Fitzgerald's trust account on July 9, 2012. Fitzgerald admitted that this never happened.

Fitzgerald admitted he told Lambert that the money still was there "[a]nytime he would ask me had it closed, I'd tell him no, it hadn't closed." A memo from Brindley to Fitzgerald dated January 29, 2013 stated Brindley would pay a total of $9 million in exchange for $150,000. Fitzgerald admitted that never happened and he was asked if it seemed unusual to get $9 million for a $150,000 investment. Fitzgerald stated: "No, not when 150 million was involved."

Fitzgerald was shown a memo, which talked about HM Treasury rules. Fitzgerald admitted he is not familiar with HM Treasury rules and made no effort to obtain a copy

of said rules.  The memo stated it would take five to eight weeks from February 2, 2013 before the deal was completed.  Fitzgerald admitted that this never happened.

Fitzgerald was asked who Gordon Brown ("Brown") mentioned in some memos was, and he testified that he understood that Gordon Brown was a banker.  A memo from from Brown to Brindley dated March 19, 2013 containing numerous spelling and grammatical errors[2] stated:

MR. Donald Brindley,

As soon as the funds is ready you will be contacted.  Diplomatic transaction
 is not as you think they are, they opened this Account for you because they
beleived the Diplomatic funds is coming in, now that is not coming in again
they need to know the reason why and also the reason why the management
opened that Account for you in the first place without knowing fully well that
you might not be able to complete the transaction.
If any of the Director's at the Bank finds guilty including me we will be sacked.
So is not something that is as easy as you think.
It is sure and certain that you will get the deposit back but that depends on
when the management are through with the investigation and decisions and
i can not say precisely the time that will be i suggested eight to ten weeks might
be then and might also be more than that, but as soon as it is ready you will be
contacted.

Sincerely,
Gordon brown.

Fitzgerald was asked if he was concerned by the numerous spelling and grammar errors in the memo from Brown, and he stated: "I didn't try to second judge it.  I don't know if he's good at what he does or not or how he got the job or if his family owned a bank.  I don't have any background to make decisions from."  He further stated: "Well, I had seen documents that showed people to be - - have certain capacity in United Kingdom that were dealing with diplomats and so forth.  I believed those documents were real."

Fitzgerald testified that Suzan Windrop ("Windrop") is at the mint, which he described as the place where they cleaned the money.  Fitzgerald never investigated whether Windrop actually exists.  He never called the mint.  Fitzgerald, however, claimed that a woman identifying herself as Suzan Windrop had called him.  A memo from

---

[2] We have reproduced this memo as it was written to show the numerous spelling and grammatical errors.

Windrop to Brindley dated March 20, 2013, which also contained numerous spelling and grammatical errors, stated that Brindley was to pay a $30,000 fine to the HM Treasury. Fitzgerald could not recall what the fine was for. Fitzgerald testified that he never contacted the HM Treasury. He stated: "I would not have because I would have to have been a diplomat in the United Kingdom to even deal with those people. He's a diplomat and I'm not."

Fitzgerald testified that a memo from Brindley to Lambert dated March 30, 2013 came through him because Lambert did not have a fax machine or email. The March 30th memo stated that Lambert had agreed to provide $150,000 in exchange for $9 million on or before April 12, 2013. Fitzgerald admitted that the $9 million never was received.

A memo from Brindley to Fitzgerald dated April 17, 2013 stated that in exchange for $100,000 delivered to London by April 22, 2013 Brindley would pay $5 million on or before May 1, 2013. Fitzgerald admitted that the $5 million never was received. When asked why he continued to take Brindley at his word and not doubt him, Fitzgerald stated: "He would supply me reasons why he couldn't and tell me what other fees got involved and what costs got involved. I wanted to keep the $150 million, so I gave him the money because George Lambert was also supposed to get 25-."

A memo from Brindley to Lambert dated April 25, 2013 talked about $250,000 put up by Lambert and gave reasons why the deal could not close. The memo stated that Brindley needed $46,000 to obtain security vans to travel in with the money. The memo also stated they needed to obtain an anti-money laundering certificate, and stated that Brindley was willing to pay a million dollars by May 14, 2013 in exchange for the $46,000.

A memo from Brindley to Lambert dated April 30, 2013 talked about Lambert receiving $2 million by May 21, 2013 in exchange for the $46,000. This memo also stated that if the funds were not paid by May 21, 2013, the $46,000 would be returned. Fitzgerald admitted that the $2 million was not paid and the $46,000 never was returned.

A document which purported to be a letter from the mint to Brindley dated May 18, 2013 talked about a diplomatic money laundering certificate. Fitzgerald admitted that he never had heard of such a certificate prior to this deal. Fitzgerald never investigated whether the mint was located at address listed on their letterhead. Fitzgerald also admitted that before becoming involved in this deal, he never had heard of an anti-money laundering certificate.

12

A memo from Brindley to Lambert dated May 31, 2013 stated that if Lambert paid $90,000 toward a "Diplomatic Anti Money Laundering Certificate," he would receive $3 million. This memo stated that payment for the certificate was scheduled for June 3rd or 4th of 2013. Fitzgerald admitted no money had been paid to Lambert based on that promise.

A memo from Windrop to Brindley dated June 5, 2013 stated "THE GROUP OF SEVEN ARE WITH US." When asked what the group of seven was, Fitzgerald stated: "I have never been introduced to the group of seven and would have no idea. You have to have security people. There would have to be a number of people. I don't think Susan [sic] Windrop would say here's $150 million, let's move it." Fitzgerald never asked anyone about the group of seven.

A letter from Angela McKay to Brindley on what purports to be HM Treasury letterhead dated June 6, 2013 referenced "Her Majesty Treasury Financial Act of 1976." Fitzgerald admitted that although he is an attorney and has been doing legal research for over 40 years, he never tried to research to see if this was a real law. The June 6, 2013 letter stated that the money laundering certificate would be issued June 6, 2013. When asked if that happened, Fitzgerald stated: "Not that I'm aware of, but it may have. I just don't know. It may have."

Fitzgerald admitted that he never investigated to see if HM Treasury was located at the address he was given. He stated: "My dealings were with Donald Brindley, not with HM Treasury. I've never dealt with anybody at HM Treasury." Fitzgerald admitted that he did no due diligence with regard to the letter purportedly from HM Treasury and stated: "that's where the treasury had issued to Mr. Brindley a certificate showing that there was no money laundering going on. That was anti money laundering." He also admitted that he never investigaged to determine whether there was such a document as a money laundering certificate or an anti-terrorism certificate.

A memo from Peter Smith ("Smith") to Brindley dated June 7, 2013 stated: "i [sic] want to assure you that nothing will stop you from leaving with the consignment once the payment of the van is made." Smith identified himself in the memo stating: "i [sic] am the director general of the MINT." When asked if the moving of the consignment as mentioned in the memo occurred, Fitzgerald stated: "Not to my knowledge, it didn't, but I was not there. I don't know what moved. I could not say it did or didn't." When asked if he would be interested in knowing whether the money had been transferred, Fitzgerald stated: "Well, and I know I have received notice that it did get transferred to the mint and it got transferred to just where I told you this morning. HSBC is where I've been told the $150 million is in the vault, at HSBC Bank in London." Fitzgerald was asked if he had

13

called anyone at the bank, and he stated: "No, I haven't. I've not been the one handling it."

Fitzgerald was asked what investigation he had done into HSBC Bank, and he stated: "Well, I'm familir with HSBC Bank from this country. This Hong Kong Shanghai Banking Company, they are owned in China but do business in lots of parts of the world. They've got several banks in the United States." Fitzgerald claimed to have seen documents on HSBC letterhead that stated that the money was there. When asked why he did not produce these documents, Fitzgerald stated: "I don't have them. I just read them. I don't have any of those documents."

A memo from Brindley to Fitzgerald dated June 7, 2013 stated that $48,000 was needed to finalize the transaction, and stated that Fitzgerald had agreed to furnish $23,000. Per the memo "[t]he remaining amount is being provided by sources in the UK." The memo further stated that "this is absolutely the last amount of money that will be needed to finalize this transaction." Fitzgerald testified that he did not know if that money ever was furnished.

A memo from Brindley to Lambert dated June 14, 2013 referred to a meeting between Brindley and Fitzgerald that occurred in Knoxville on June 10, 2013, and stated that Brindley's power of attorney had expired and Brindley needed $11,000 for expenses to obtain a new power of attorney. The memo promised $250,000 in exchange for the $11,000. When asked if the meeting referenced in this memo happened, Fitzgerald stated: "I'd say it did."

A memo, which purports to be on letterhead of the mint dated July 10, 2013 stated that once a money laundering certificate, an "ANTI-TERRORIST" certificate, a current power of attorney, a diplomatic license, and a "USA INTERNATIONAL PASSORT [sic]," were produced nothing could stop or delay finalization of the transaction. When asked if the anti-terrorism certificate had been obtained, Fitzgerald stated: "I believe I've seen a copy of entity some time." Fitzgerald admitted, however, that the transaction had not closed. When asked why if the certificate had been issued the deal had not closed pursuant to the letter, Fitzgerald stated: "I don't know. . . . I have had more than one of those."

A memo from Brindley to Lambert dated July 26, 2013 promised $5 million in exchange for $135,000 when the money from the consignment was deposited on or before August 3, 2013. The memo also stated that if the transaction did not finalize, Brindley would bring the $135,000 back when he returned from London. Fitzgerald admitted that this did not happen.

A memo dated July 30, 2013 from Brindley to Fitzgerald referred to a meeting between Brindley and Fitzgerald in Nashville prior to Brindley going to London during the third week of June. When asked if he went to Nashville to meet Brindley, Fitzgerald stated: "No. Never been to meet with him, ever."

Fitzgerald admitted that a lot of the money that went to Brindley went through Fitzgerald's trust account. When asked why he wrote checks to different people from his trust account and then had them cash the checks, Fitzgerald stated: "To turn it to cash." When asked why he did not write the checks to himself, he stated: "I think that might be your position, the way you would want to do it, but that's not the way I chose to do it. . . . That's just not the way I chose to do it. I just needed to get some cash there, and that's the way I decided to get the cash out of the bank." Fitzgerald admitted that he has no proof that he did not keep the money himself. With regard to the checks written to various individuals the following questions and answers were elicited:

Q. Now, wouldn't it have been a lot easier to go to one bank and cash a check rather than going to a bunch of different people sometimes in different counties and writing a bunch of different checks?

A. I don't agree with you. That's not the way I thought it should be done.

Q. Why not?

A. I just had my choice. There's a lot of ways to do a lot of things, and that was my choice of how to do it.

Q. You have no proof that you gave $155,000 of Mr. Lambert's money that he gave you to Donald Brindley, do you?

A. Yes. I believe that was all wired. I believe it was. Anyway, I've got - - maybe that one wasn't wired. No, it wasn't wired. No, I don't have that proof, no. I furnished you checks of what was cashed for people to get Mr. Lambert's money out of the bank.

Fitzgerald wrote a check on his trust account dated August 10, 2012 to Laura Knight for $9,000. Fitzgerald testified that Laura Knight is his secretary. When asked why he wrote that check, Fitzgerald stated: "I've already told you this morning I let different people take money out of the bank so I could send cash." Fitzgerald placed a code on the check, and he stated: "I put codes on most of the checks I write period. I don't want people to open my check and find out why I sent it necessarily. I put codes on lots of checks." Fitzgerald testified that the code he used meant that the money was

15

going to Brindley.  When asked why he wrote the check for less than $10,000, Fitzgerald stated: "Didn't have a particular reason.  I just don't write big checks usually.  I write small checks usually."  Fitzgerald admitted that he instructed Laura Knight to cash the check.

Fitzgerald wrote a check to Tucker from his trust account also dated August 10, 2012 for $9,000 with the same code on it.  He admitted that he instructed Tucker to cash the check.  When asked if he was trying to circumvent the $10,000 bank reporting requirement, Fitzgerald stated: "I've never had a problem with that.  Banks have always cashed whatever check I've handed them."  When pressed to answer the question, Fitzgerald stated: "No, I was not.  If I was to do it over today, I'd do it just exactly like I did before.  Because you might want to do it one way doesn't mean I want to follow your pattern."

Fitzgerald wrote a check to himself from his trust account on the same day, August 10, 2012, for $8,000 with the same code.  He admitted this check was not for a fee earned, but "was to send money that was probably part of what George Lambert had just put in more than likely."

On the same day, August 10, 2012, Fitzgerald wrote a check from his trust account to Howard Upchurch for $6,000 also containing the same code.  When asked why he would write a check to an attorney in Pikeville to get cash when his office was in Dayton, Fitzgerald stated: "Might have been in Pikeville that day."  When asked why he didn't simply write a check to cash if he wanted cash, Fitzgerald stated: "I told you I decided the method to use and not your method.  I used my method.  I don't plan to start using your method.  I'm going to use my method."  Fitzgerald was asked whose money the check represented, and he stated: "Somebody who had put money to send to Brindley because it's got the code on it. . . .  At this point in time it was probably George Lambert's. . . . I'd say it was because it was written right after the $32,000 deposit and identified Mr. Lambert on each deposit."  Fitzgerald admitted, however, that during his deposition he had stated that he would need to ask Brindley whose money it was because he had no records.  He also stated: "Right now - - when you asked me that in the deposition I'd say I hadn't just been given a deposit slip for George Lambert that show those checks probably amount to the amount of George Lambert's money."  When shown a deposit slip for $154,567.24 being deposited into his trust account, Fitzgerald admitted that this money came from George Lambert.

Fitzgerald wrote a check to Tucker dated April 5, 2013 for $9,500 with same code.  He testified that he instructed Tucker to cash this check.  When asked, he gave the same answer he previously had given as to why he wrote the check for less than $10,000.  When asked if he had any records to show what happened to this money, Fitzgerald

16

stated: "No. It was sent off in cash." Fitzgerald wrote a second check to Tucker dated the same day, April 5, 2013, for $8,000. When asked why he would write two checks from his trust account to the same person on the same day, Fitzgerald stated: "If you don't understand, I've told you several times I do write big checks. Might wright one every now and then. I just don't write big checks." Fitzgerald was asked why he couldn't have written one check for $17,500, and he stated: "That might be the way you want to do it but that's not the way I wanted to do it. No, I didn't write it that way." When asked if he was aware that both checks were written for amounts under the $10,000 reporting requirement, Fitzgerald stated: "I don't look at the reported requirement. I don't give hardly anybody a check for $10,000." When pressed to answer whether he knew the checks were for amounts below the reporting requirement, Fitzgerald stated: "I did know it was beneath the reporting requirements."

Fitzgerald wrote a check dated April 8, 2013 on his trust account to Joyce Rothwell, his former secretary, for $9,000. He admitted that Joyce Rothwell was supposed to cash the check and that he had no record of what had happened to that cash. This check also contained a code standing for Brindley.

On April 8, 2013, the same day that he wrote the check to Joyce Rothwell, Fitzgerald wrote a check on his trust account for $50,000 to First National Bank, which he cashed. Fitzgerald admitted that he has no record of what happened to that cash "[o]ther than just I say that I sent it to Donald Brindley."

Fitzgerald wrote another check from his trust account on April 8, 2013 for $9,500 payable to Southeast Bank. When asked if this check represented client funds, Fitzgerald stated: "It was where a check had been deposited that didn't belong to me. If money doesn't belong to me, I put it in my trust account. I don't put people's money in my personal account if it's not mine." When questioned further Fitzgerald admitted that this money came from Lambert, that Fitzgerald had cashed the check, and that he has no record of what happened to this money.

Fitzgerald wrote another check from his trust account on that same day, April 8, 2013, payable to a bank for $9,000. Fitzgerald admitted that he cashed this check and has no record of what happened to the money. Fitzgerald wrote another check from his trust account that same day, April 8, 2013, to Jason Fitzgerald for $5,000. Jason Fitzgerald is one of Fitzgerald's children. Fitzgerald admitted that he instructed his son to cash the check and that he has no record of what happened to this money. Fitzgerald wrote yet another check on his trust account on April 8, 2013 to Jeremy Fitzgerald for $8,000. He admitted that he has no record of what happened to this money.

Fitzgerald wrote a check on his trust account on the same day, April 8, 2013, to Tucker for $1,700. He admitted that he instructed Tucker to cash the check and that he has no record of what happened to this money. Fitzgerald stated: "No records of the cash, but I believe that's the amount it took to get all of George Lambert's money sent out, I believe is the way it was, I'm not sure."

When asked if he as an experienced attorney thought that he should have been keeping records of the hundreds of thousands of dollars coming in and going out, Fitzgerald stated: "I was keeping records. When I look at this check, I know what's spent out. I don't have a record other than this check, but I know when I gave Andy Tucker $1700 [sic]. That's my record of what happened to the money." Fitzgerald admitted, however, that he could not tell from the check where the money went. When asked if he could tell where the money came from, he stated: "I figured against my deposit slips, the way I did it, and took the right amount of money out, yes."

Fitzgerald wrote yet another check on his trust account dated April 8, 2013 to Laura Knight for $8,000. This check also contains a code for Brindley. Fitzgerald admitted that he instructed Laura Knight to cash the check and that he has no record of what happened to the money.

When asked why he did not write a check to Brindley, Fitzgerald stated: "I just chose not to do that." Fitzgerald also was asked why he did not wire money to Brindley or send Brindley a cashier's check, and he stated: "I chose not to do that." Fitzgerald admitted that these methods would have left a written record, whereas, the way he did it leaves no record.

Fitzgerald wrote a check on his trust account on April 9, 2013 to Joyce Rothwell for $8,000. He instructed Joyce Rothwell to cash the check and admitted he has no record of what happened to this money. Fitzgerald wrote another check on his trust account on April 9, 2013 to Laura Knight for $7,000. He admitted that he instructed Laura Knight to cash the check and that he has no record of what happened to this money.

Fitzgerald wrote two checks to Tucker from his trust account on that same day, April 9, 2013, one for $8,000 and one for $7,000. When asked if he had an explanation for the two checks, Fitzgerald stated: "I've already explained that to you, that I normally don't write anybody a big check period. I wrote one awhile ago to a bank, but no, I normally don't write anybody big checks."

Fitzgerald wrote another check on April 9, 2013 on his trust account for $4,000. He testified that he cashed this check. When asked if he had a record of what happened

to this money, Fitzgerald stated: "Except for where I say it went. This is the way I kept up with it." He admitted that he has no written proof that he did not put the money in his own pocket.

Fitzgerald deposited $1,750 to his trust account on June 24, 2013. The deposit slip contains a notation that reads "Lambert." On July 22, 2013 Fitzgerald deposited $3,000 to his trust account. This deposit slip also contains the notation "Lambert."

Fitzgerald admitted that he met Brindley in Knoxville a couple of times during the period from June through December of 2013 and gave Brindley money, but he did not know whose money it was. He did admit, however, that it was not his own money. Fitzgerald also admitted that Brindley had given him multiple deadlines for when he would return money to him, but has met none of those deadlines.

Fitzgerald admitted he made a wire transfer of $7,000 from his trust account on August 15, 2013, days after a restraining order in this case was entered. Fitzgerald claimed this was his own money. He further admitted that he made a wire transfer of $3,000 from his trust account on September 17, 2013, while the restraining order was in place. He claimed this also was his own money. When asked why he violated the restraining order, Fitzgerald stated:

> Why I believed it was all right to do these. I thought we could do things in the ordinary course of business, and until I talked to you and you told me not to send anything to Donald Brindley, I did this because I thought it was closing the thing completely.
>
> And this would have been the ordinary course of business if we were closing this out. I thought I was just doing something in the ordinary course of business.

Fitzgerald admitted that his financial statement dated November 2013 showed his net worth at $561,898 and showed that he owns more than 35 parcels of real property. Fitzgerald was questioned about where he obtained the money that he allegedly personally invested in the Investment and the following questions and answers were elicited:

> Q. I asked you where did you get the money for that alleged investment, and you told me you withdrew 90- or 100,000 from an IRA and a small amount from a life insurance policy.
>
> A. I didn't tell you a small amount, no.

19

Q. Well, you said it was about 100,000.

A. I wouldn't call that small. I thought you were talking about tens, twenties, thirties.

Q. If you took 90- or so from your life insurance and put 100- in, then that was a small amount, $10,000 in life insurance?

A. No. I took a hundred from one and ninety from the other.

Q. Where did you get the rest of it from?

A. I produced copies of where I had gotten money from banks.

Q. No, sir. You remember you told me before you never borrowed money from banks for this investment?

A. I believe before you asked me where I could have got it maybe.

Q. I asked you where you borrowed money from. You said you didn't borrow money from banks. Do you remember that?

A. I said I didn't borrow money from banks where there was anything to do with this loan. There is nothing about this investment secure in the bank, no.

Q. Remember when I asked you about where you got the other $400,000?
    You said, Oh, I don't keep all my money in the bank. Are you talking about you keeping cash somewhere?
    Yes, I did because it was cash I had stored.

A. But the other question I thought you asked me was different money that I had banks that had loans out with me, but not necessarily for this project. Yes, I did pay cash. It was all in cash.

Q. But you didn't borrow money from a bank to invest in this project?

A. Not that I recall

Fitzgerald did admit, however, that he borrowed $18,000 from Lambert. Fitzgerald drafted a promissory note dated October 19, 2009 for this loan from Lambert. The promissory note states the loan was made with zero percent interest. Fitzgerald was asked if he often prepared notes to his clients with zero percent interest, and he stated: "That's what George Lambert told me to do. He said he wasn't going to charge me interest on that." Fitzgerald admitted he did not tell Lambert to get independent legal advice because he "didn't think he needed independent legal advice." The promissory note was due July 1, 2010. Fitzgerald admitted that he never paid off the note. He stated: "I didn't because what George Lambert said to me."

When asked if he had told Lambert that he was going to get $90,000 in return for the $18,000, Fitzgerald stated: "That was the promise that had been made to him by Mr. Brindley." Fitzgerald, however, agreed that he was the one who relayed that information. He stated: "That's right, I did. Now, that was a borrow. That was not an investment. I borrowed 18,000 from George Lambert, sure did." When asked about repaying the loan, Fitzgerald stated: "The agreement was that I would pay him when the pipeline sold." Fitzgerald agreed that he signed the promissory note, and that it came due years ago. When questioned further about why he had not repaid the loan, Fitzgerald stated:

> Because of our agreement. On August 6th of 2013 George Lambert came to my office and asked me - - . . . . George Lambert came to my office on a Saturday morning. I just happened to be there. I didn't know that George was coming on August 6th. He asked me for a statement about him getting his investment back with Donald Brindley, not with me but with Donald Brindley when I sold the pipeline.

Fitzgerald agreed, however, that the promissory note does not state this, and he stated: "It doesn't but George Lambert said this was our deal. I typed this up and signed it."

When asked if he had told Lambert that someone had offered to buy the pipeline for $10 million, Fitzgerald stated:

> Well, more than that. . . . Well, different people have had some financing problems. There's nobody that's done it now, but it would not be unusual to get that kind of money because in our business records I have an appraisal of the pipeline that says if you went to build a pipeline today, it would cost $42 million to build it. That's part of the business records I brought today.

Fitzgerald testified that the pipeline is owned by Energex Corporation and that he is the secretary and registered agent of that corporation. When asked how much he had paid for his 54 percent interest in the pipeline, Fitzgerald stated:

> Bedford Patterson paid for the pipeline. Then he brought me in and asked me to work with him in the pipeline. . . . I didn't have to pay for my stock. Bedford Patterson paid it all. We'll just have to see what I get out of it when it's sold, but I will not get 50 percent of it. . . . The pipeline is in Scott County, Morgan County, and Fentress County. There's 140 miles of eight- and ten-inch steel, and there's a total of 339 miles of the whole pipeline. There is one backup compressor sitting on it that the compressor alone probably costs more than what we're talking about in this lawsuit. So there's money to come from the pipeline.

When questioned further, Fitzgerald admitted that he paid nothing for his interest in the pipeline. He claimed that he had received an offer to buy the pipeline for $10 million within a year of December of 2013. When asked at his deposition who had made this offer, however, he could not remember the name of the person or company. He stated: "There has been several people who want to buy it. In fact, there's three or four signed contracts right now where people are trying to get it closed, different ones. Every contract says the first one that brings money gets the pipeline."

> Fitzgerald was questioned about a letter dated August 6, 2013, and he stated:

> He was concerned about not filing a lawsuit and not just about the money. He said, if you'll give me this statement, and he told me what he wanted it to say. He said on Monday morning this will all be over. Monday morning would have been August 8, 2013.

> He said I'm not going to file a lawsuit against you. George Lambert specifically said to me on the morning of August 6, 2013, you do not owe me any money. Said, this is our deal. I'd typed up this letter. It says, as I stated to you - - and this was addressed to Sam George Lambert, dated August 6, 2013.

> As I stated to you in previous conversations, if the money that you invested with Donald Brindley - - now, not me but Donald Brindley - - is not repaid by the time that I sell my interest in the natural gas pipeline, I will pay from the proceeds of the sale of the pipeline the amount of your investment.

22

George Lambert looked at it and read it before I ever signed it. He said, this has been our deal from the beginning. Just sign this and this is all I want. I'm not going to sue you, and you don't owe me any money. I signed it and handed it to him.

Bridget Tussey, a closing agent at Preferred Title, testified that she has done some closings for Fitzgerald. Ms. Tussey was the closing agent for a closing on May 1, 2013 in which John Adams Sims was the buyer and Lambert was the seller. Fitzgerald attended the closing and stated that he was Lambert's attorney. Ms. Tussey testified: "It wasn't an actual closing. The buyer just bought a title insurance policy and a deed from us. We didn't do an actual closing."

Ms. Tussey explained that there was a transfer of $50,000, but that it was unusual as "[t]hey didn't do it in our office. They went out to the parking lot to Mr. Fitzgerald's truck." Ms. Tussey testified that she saw the exchange through the window, and stated she "saw Mr. Sims giving him cash." This struck Ms. Tussey as very unusual. She stated that Fitzgerald left the closing with the cash and Lambert had already left previously. Ms. Tussey explained that she had planned to step out of the room during the exchange of the purchase price because her title company requires a cashier's check to have a "[p]aper trail" and the parties refused to bring a cashier's check. So Ms. Tussey planned to step out of the room to avoid being involved in that transaction. She stated: "Mr. Fitzgerald said, we're going to take it out to the parking lot to my truck." Ms. Tussey watched the transaction through the window and the windshield of the truck because Mr. Sims had not yet paid for the title policy and deed and she wanted to be sure he would return to the building. She witnessed them counting out the cash. Ms. Tussey stated that Lambert already had left by that time. Lambert had signed the deed and Fitzgerald told Lambert he could leave. Ms. Tussey stated: "[Fitzgerald] kept pushing him and saying his wife was in the car and she had Alzheimer's and she needed to go." Fitzgerald was the only person on the premises associated with the seller at that point in time.

Fitzgerald admitted that he attended a closing where Lambert sold property and that he left with the money, but could not recall whether the money was in the form of a check or was cash. He testified that the closing involved a parcel of real property owned by Lambert. Fitzgerald testified that he did not ask Lambert to sell that property. After Ms. Tussy testified, Fitzgerald was asked if he recalled being at the closing, and he stated: "I remember being at the closing now." He admitted that he received the funds "[o]ut in the truck like she said." Fitzgerald was asked if Lambert was present, and he stated: "I understood Mr. Lambert's wife got sick, and George told me to go get the money. . . . I said, I'll send this money where you told me to send it. That's what I did. . . . To Donald Brindley."

23

Lambert testified that at the time of trial he lived at Morningside Living Assistance, an assisted living facility. Lambert testified that he had cancer, but his mind was still clear and sharp. During his life, Lambert attended approximately three quarters of a year of college, worked at rock quaries, and eventually owned a quarry. Lambert stated that he had known Fitzgerald for over 40 years, and that Fitzgerald was his attorney and a friend.

Lambert testified that Fitzgerald told him about the Investment. He denied seeing papers in Fitzgerald's office and reading them and stated: "Only way I knew about it was what he told me." Fitzgerald told Lambert that they would both receive $25 million from the deal. Lambert testified that he believed Fitzgerald and stated: "He was heavily involved in it and dealt with the one that was doing the deal. He was my attorney and friend, and I relied on him." An exhibit was introduced at trial showing Lambert's claimed losses from the Investment in the total amount of $699,567.54

Lambert testified that the deal never has closed and that none of the things Fitzgerald has told him about the Investment ever have come true. He stated: "Each time it was a new problem that had to be resolved. . . . Well, there was washing the money. There was fees on storage, on moving the money, on different government restrictions, and just many purposes." Fitzgerald kept telling him they need to raise more money so Lambert kept giving more money.

Lambert testified that prior to August 6, 2013 Fitzgerald never gave him any documents relating to the Investment. He was not sure if Fitzgerald had shown him anything while Lambert was in Fitzgerald's office or not. Lambert testified that he never met Brindley. He stated that he only spoke with Brindley two times and: "[t]hat was after the last time they said that they were going to close and didn't close."

Fitzgerald told Lambert that Brindley wanted the money in cash. Lambert testified he sold real property because Fitzgerald "came to me and said this was going to be the final of the final, I think, of closing this. . . . Said they were going to close that weekend. We got the money that week, and it was - - I sold this for $50,000." He testified that the property actually was worth $175,000. When asked why he sold it for $50,000, he stated: "Well, they said they could not raise the 46,000. I told them I didn't have any way to do it either. So a couple of days later they came back and said, well, he'll give you another million dollars if you come up with the 46,000." Lambert stated that Fitzgerald was the person who told him this. When asked, Lambert admitted that he went to the person who previously had been interested in purchasing this property and offered to sell it to him for $50,000 and did not negotiate the price. When asked if he felt

24

like Fitzgerald was controlling him, Lambert stated: "Nobody was controlling me. Still don't control me. They help me. They don't control me."

Lambert was asked about Fitzgerald's testimony that he constantly asked Fitzgerald if he could put more money in, and he stated: "I never did do that. . . . I am positive." He did admit:

> On that last request I said, we can't let this - - can we let this thing fall through for $46,000 after I've got 150- or more in it and you've got half a million you say? Can we all not come up with $46,000?
>
> For another two days they said they couldn't, and he would raise the value of me coming up with it for another million dollars.

Lambert stated that he never said he wanted to put more money in, but that he did say that he would keep the deal from falling through.

When asked why he didn't hire an accountant to investigate the Investment, Lambert stated: "I didn't feel like I needed to. Arnold was my lawyer and friend." Lambert testified that he was involved in a prior bad investment involving Albert Arnold ("Arnold"), who he stated "was kin to Arnold Fitzgerald some way. I met him. He was a promoter." Fitzgerald, however, had nothing to do with that deal. Lambert explained that Arnold told him about a deal wherein he could invest a million dollars and receive $20 million in return. Lambert was told there were some churches involved in that deal. He testified that a lady from London came over to set up the deal. The FBI later became involved in investigating that deal, and Lambert testified that the lady from London was prosecuted. He went to England to testify against her, and ultimately got $900,000 of his money back. Lambert admitted that he knew that potential scams existed.

Lambert was asked about the allegation that Fitzgerald should have known the Investment was a scam, and he stated: "Should have known it when I knew it. . . . I knew it whenever the final - - final final in other words. We had a lot of finals. The final final didn't work out. . . . That's when I realized it was a fraud."

Lambert began putting his own money into this deal, as opposed to loaning money to Fitzgerald, in November of 2011, and he put money into the Investment approximately thirteen times. He stated:

> But he guaranteed these, every one of these before I gave it to him. . . . All right. I gave it to him on his word, on his belief. I was taking his word for it in more ways than one, that he would guarantee these, that I would not

25

lose my money. I told him, well, you know, if it don't I'll wind up and sell my house. Right now I'm selling my house.

Lambert testified that he gave each of the payments to Fitzgerald, and he stated: "I trusted him to give them to Brindley. I don't know where it went."

Tucker testified that he is an attorney in Dayton, Tennessee. Tucker practiced law with Fitzgerald for several years, but opened his own office in 2007. Tucker's practice and Fitzgerald's practice are completely separate and are not affiliated. They do not share trust accounts.

Tucker testified that he invested $75,000 of his own money in the Investment. He was promised a return of $750,000 within 24 hours of the closing plus $350,000 for his efforts in obtaining the $75,000.

Tucker was asked about his further involvment with the Investment, and he stated:

After the obvious devastation of that not taking place as Brindley reported, there was follow-up activity, I guess you would call it. He said, well, it's going to take place; they have got every issue addressed. So at that point, obviously I have great concern over my investment that's outstanding at this point.

My request was basically to - - when they have this resolved, to be at the bank. He was wiring funds back to the United States, and I wanted to ensure those wires occurred and that I didn't somehow get cut out of the deal.

Tucker was asked what bank, and he stated: "Whatever bank they were sending these wires from. . . . That was the problem. I never knew where the bank was that they were dealing with other than the bank that he was dealing with was somewhere in/or around London, England."

Tucker testified that he went to London, and he "wanted to make sure that [he] wasn't cut out somehow." Fitzgerald paid for Tucker to go to London. Tucker went to London more than one time, and he stated it was possibly three or four times. He stated that he usually would stay two or three days and would meet with Brindley. When asked if he took money to Brindley, Tucker stated:

I would deliver like a nine-by-twelve envelope. Oftentimes it was sealed and had some sort of clasp on it. I understood that it had documents in that.

>Sometimes I understood there to be money. I wasn't aware of what was there. The forms were supposed to be filled out and ready. I don't know.

Tucker stated that his understanding of what was in the envelopes he delivered was "[p]owers of attorney. I'm not sure if there were instructions about the wiring instructions for accounts. I do know at times there was money. I don't know how much." When asked if he ever crossed a national border carrying more than $10,000 in cash, Tucker stated: "It's possible."

Tucker testified that he did not open the packages. He would meet Brindley face-to-face and give him what Fitzgerald had given Tucker to deliver. In Houston they met at the airport. In England they met in a hotel lobby or coffee shop, but Tucker could not remember exactly where they met in England. Tucker testified that London and Houston were the only places that he met Brindley. When asked if he ever got money from anyone to deliver to Brindley in any other location, Tucker stated: "I got some documents and what obviously was purported to be some money from a gentleman in Chicago."

When asked if any problems ever arose in connection with the deliveries, Tucker stated:

>The last time that I had any dealings with this was to take some money to him in Houston. I recall that because I said cut out or not, I'm kind of frustrated with the process. There was an envelope that had come open. They said that some money had come out. I know that Mr. Fitzgerald asked me because Brindley called him and was livid that he had been shorted something. . . . It had come open in my truck as I was rushing to the airport early one morning.

Tucker could not recall how many times he met with Brindley to deliver things. He stated that it was "more than five," but could not recall if it was more than ten times. Tucker could not recall how many times he went to England, but stated it was "more than three or four."

When asked if after failing to receive a return upon his initial investment of $75,000 he invested more, Tucker stated: "Possibly another 10,000, but I'd have to look at records to see. I'm not sure." Tucker admitted he never has received a return on his investment with Brindley. Tucker testified that he is not in communication with Brindley and is doing nothing to try to recover his money from Brindley.

Tucker testified that he did not have a group of investors, only himself. When asked why he told Fitzgerald he had a group of investors, Tucker stated:

27

I would have wanted to make it clear that I wanted these funds back. I wanted to in many respects distance myself from being emotionally involved in this just as you would in dealing with anything that could be stressful where your own money is involved, such as buying a vehicle when they're trying to pressure you. I didn't want to have any more pressure about saying, oh, I need more money.

Brindley testified at trial. He stated that he lives in California in an Extended Stay motel. He stated: "I've lived there for three rough years since I lost our house."

Brindley testified that Fitzgerald became involved with the Investment in 2008, and the money was moved to the mint in 2012. Brindley admitted that he solicited money from Fitzgerald and that he received money from Fitzgerald "to assist [him] in the financing of the transaction." When asked how much money he received from Fitzgerald, Brindley stated: "If memory serves me, somewhere around $517,000." He admitted that he does not know whose money he received from Fitzgerald.

Fitzgerald introduced Brindley to Lambert. Brindley testified that he spoke with Lambert via phone during 2011. The only phone calls with Lambert that Brindley could recall was when Lambert was with Fitzgerald in Fitzgerad's office and they spoke on a speaker phone or conference call.

When asked how he became involved with the Investment, Brindley stated:

At one of the investment meetings that Mallory Horne and I was at in Florida, we also met a Dr. Howard Fields. Through him I was introduced to these diplomatic consignments that we're now involved with. . . . I guess they can be involved in several different types of things, but they - - in our case as an example, there is the flow of money from one country to another to either stay there and go through all of their regulations for that money to come into the country and then do as they can, or it could be transferred on to another country which is the final location.

As I found out through it, this can be involved in any number of things as far as valuable types of things or even documents that are being transferred from one diplomatic source to the other.

Brindley stated that he then went to London and met with Dr. Fields. Brindley stated:

He introduced me to a gentleman by the name of Tony Woods, who is a diplomat who was in this business and used to work for a company that specialized or just did that business around the world. He branched off on his own and he introduced - - discussed with me and Howard this transaction.

Brindley was asked about the Investment, and he stated:

It is $150 million United States dollars, and it was already in London in customs. They needed a beneficiary. Under the requirements of this, the owner can't be also a beneficiary. So we discussed the possibility of me being the beneficiary of it. I looked into it and made a decision that I would become the beneficiary. . . . As the beneficiary, the consignment would be placed in my name after I was approved and could be a beneficiary. I had to go through a process for that and get approved of that and so forth. Then that beneficiary, or me as the beneficiary, sorry, was registered on the six containers in this transaction and on all documents thereafter.

One of the things that I ended up needing to do, which I thought at the outset was going to be a minor amount, was to provide funds if I so elected, I didn't have to, but provide funds for additional expenses that might be involved in the transaction. For that I would receive a percentage of the total amount.

Brindley testified that the money is owned by Ebenezer Bonaparte ("Bonaparte"), who lives in Southwest Africa. Brindley stated that he met Bonaparte once in London. When asked why Bonaparte would give up $150 million, Brindley stated:

I hope I'm answering this correctly. I was appointed with the full power of attorney over it and for raising the money, whatever it took, and it got a little out of hand. That would be deducted and then he would end up receiving 60 percent of the total of 150-. . . . He was willing to give up - - for me to be the beneficiary a portion of it. Then I was to reinvest the net proceeds into a high-yield investment program that I'm very familiar with, and he would eventually gain back to his full amount.

Brindley admitted that in essence this transaction is costing 40% of the value of the money to protect it with this special coating.

Brindley testified that he had to obtain a beneficiary card and then a diplomatic license. Brindley showed the beneficiary card and the diplomatic license at trial. He testified that Tony Woods ("Woods") brought Brindley the beneficiary card and the diplomatic license. Brindley stated that Woods "was diplomat in charge of the full consignment consisting of $150 million."

Woods told Brindley that the consignment was in cutoms. Brindley stated:

There was a fee that had to be paid, and I went with him to - - sorry, Heathrow Airport where the customs and this is being held. And as I understand, it was a special section where these diplomatic things come through. I went there. I also met the supervisor that was in charge of that area, and there was a fee that had to be paid.

Brindley testified he paid that fee with his own money. He stated that he gave the money to Woods. He also stated: "And Johnson Craig (phonetic) was present, who is involved with the Heathrow customs office. . . . He's a senior supervisor. I don't know the exact title. I have it someplace." Brindley explained his understanding of what was to happen after that fee was paid, stating: "Once it was made in customs, it was supposed to be cleared. Then at that time the transaction was going to proceed to Nationwide Bank. Mr. Gordon Brown from that bank was giving us instructions of what had to be done and how it was to be processed."

Brindley admitted that the money did not go to Nationwide Bank. He stated:

We moved - - I did not - - by secured vans. Because of the value, they can only allow half of it to be in each one of the security vans. They look sort of like our Brinks trucks but on a smaller scale. . . . They were transported because Mr. Brown instructed it to be. It was transported - - we had to pay for in advance on those vehicles. It was from Heathrow to Gatwick Airport and then placed into their customs there. From there they were going to go - - as I understand, as I recall, Nationwide had two outlets that process this type of transaction.

The transaction, the items or the notes were coated so that they couldn't be stolen. They had two outlets of theirs. One of them was in the United Kingdom and one in Scotland, where they could actually process these notes and then put them through and be able to certify them to certify them at their bank.

We moved it to Gatwick because the one in England, the machinery was not operational and would not be for several months. So we were going to, under his instruction, move them to their Scotland bank for this to be done.

Brindley testified that he paid the money for the transport to Woods. Brindley stated that this money "went to, and excuse me if I can't recall the exact name, but a diplomatic courier service in London." Brindley explained that Woods was the "diplomat in charge" and "had to be involved in every phase of the transaction."

Brindley was asked what processing was needed, and he stated:

The bank would do the processing for their clients, but we had to pay for the chemicals for their machinery. Those are quite expensive. The chemical that they and another company used comes from Spain, and there's a special thing to it. We - - again, I paid for it, gave the money to Tony Woods. I did receive a receipt from the company in Spain for that amount of money. . . . The chemicals would clean the notes so that then they were capable of being deposited, or if you had a couple of bills you wanted to use at the grocery store, I guess you could use them there.

Brindley further stated:

From the outset I was told they were coated with this special coating, I can't describe it to you, so that they were protected so that if someone tried to steal the consignment, they couldn't just open them up and take the notes because this isn't visible to the eye.

They couldn't take notes to the bank and cash them or wherever they might use them to buy something. That's why they were coated that way, to protect them from being stolen.

Brindley was asked if he ever actually saw the money, and he stated:

I saw - - first off, the money, before it went to Gatwick, I saw a portion of it. . . . I can't recall exactly, but there was several thousand dollars removed from one container. There's six containers. . . . I was told it was removed. I was not physically there as it was removed. Tony Woods brought them and these chemicals from this one bottle from the chemical company to my hotel room. He actually used that chemical in my sink, just

the chemical, not water; and then washed these notes in the chemical process. I stood and watched it take place.

Then he just dried them off with a towel and said that I could - - I think I took five or seven of them, the hundred dollar bills. Excuse me. Five or seven of them. He gave them to me and said do what you wanted with them the next day and prove to yourself that they're real.

There at my room I had one of those pens with me that grocery stores and so forth use to mark a bill with. It did okay there. So the next day I went down to a money exchange place and presented the bills to them and asked if I could exchange them for notes - - I mean pounds, excuse me, instead of U.S. dollars. They examined them, checked them over, and accepted them.

Brindley testified that Gordon Brown's Nationwide Bank changed their policy and it was recommended that they move the consignment to an entity that "goes under the name of the mint." He stated:

It's not Britain's mint where they do all of their currency printing and so forth. I believe that one is in Scotland. I might be wrong. It was there in London, and I understand they are an arm-length company from the government.

So Tony Woods had to go there. Being a diplomat, I couldn't just show up at their door or you couldn't show up at their door and say will you do business with us because you have to have special licensing and everything, again as I've been told and found out through this.

So they agreed, if we would transport the six containers from Gatwick to their facility in London, that they would examine them. And so we again had to hire the vans, 15,000 pounds each time, and took them to the mint. The mint opened the containers, examined them there without processing them.

When asked what happened next, Brindley stated:

To process this sum they charge 230,000 pounds. One half of that had to be paid up front before they would do it. They had verified that it was real, so we knew that we had real notes. I then infomed Mr. Fitzgerald about it,

of course.  The money was raised and we paid the first portion.  The mint then processed them.

Prior to us being able to - - one of the conditions prior to being able to then have the notes removed from the mint is that we had to pay the second half.  Again we put that money together and paid it.

Brindley admitted that the money still had not been released.  He stated:

After that payment was made, second part to the mint, we thought at that time that was all that would have to be paid.  The day that it was going to be removed, they asked not only for me to bring my passport and beneficiary license, but they also called for a diplomatic license, which to that point I didn't know anything about.  So then we stopped.  Then I had to go through the process of getting diplomatic license.

Brindley further testified:

Then we needed to get an anti money laundering certificate. . . .  Then the next thing we had to do was get an anti terrorist certificate, and I have documents from the treasury department requiring this of Her Majesty's Treasury Department.  We did that, and we had to pay some late fees to the treasury department.  We had to pay storage fees when these things had been sitting at the mint.  They don't do this just free.

Brindley testified that he then received a memo from Mr. King at HSBC Bank and then two letters from HSBC Bank, one from Mr. King and one from Mrs. Bowyer, and one letter from "forgive me, I can't recall - - from their European combine that they're all involved with and on their letterhead, telling me they had all met."  He stated that the letters told him that a $250,000 payment was required for final clearance in order to have HSBC Bank transfer the money to a bank or account of his choice.  Brindley stated: "To this day I haven't - - I've tried to put the money together.  I've not been successful yet."

Brindley was asked how much time he has spent in England since 2008, and he stated: "My passport, at the back of it where they stamped it, there's 31 different stamps coming to Heathrow.  Some of those trips I would be there for a week, and I was there on some occasions for a couple of months."  Brindley admitted that it cost money to make those trips.  He stated: "More expensive there."  When asked where the money for the trips came from, Brindley stated: "Part of the money came from me.  Part of it came from Mr. Fitzgerald.  And where I was going to be using a small part of what was being put up, I always spelled out the amount of my costs to go there."

33

Brindley admitted that the payments he made for the Investment were always made through Woods and that Brindley never was present when Woods used the money. Brindley was asked if he ever told Woods that he needed to be present, and Brindley stated:

> He explained that until I actually had this cleared from the mint that I was not entitled to do that. I was also explained that by Peter Smith, the director general of the mint, letting me know that I could not do that. Mr. Brown did and so did Mr. King. Mr. King openly says that I now can come to the bank and do as we have talked. . . . Complete the transaction and I can bring who I want with me.

When asked what due diligence he did with regard to Woods, Brindley stated: "The only due diligence I did about him, which was very minimal, was when I was introduced to him in London when he produced his diplomatic passport and license. With that I accepted it as being real." Brindley was asked what country Woods was a diplomat from, and stated: "He was from England, and he was a diplomat out of England," but Brindley could not answer what country Woods was a diplomat to. Brindley was asked if he did any research on whether there is such a thing as an anti-terrorism certificate, and he stated:

> I can only answer it this way. I have the registered numbers of the money laundering certificate and the terrorist certificate, and when I go back on this trip, if I can, to finish this, I will be given copies of both. And the treasury department on their letterhead told me yes, that's what was required.

Brindley admitted that he never has been to HM Treasury. He was asked if he was aware that the address on the HM Treasury letterhead does not exist, and Brindley stated: "No." When asked if he had been aware of that fact if it would have impacted his investment, Brindley stated: "Certainly would have caused some concern, that's for sure." He stated: "The address was explained to me for simply diplomatic purposes. I have physically been to the address of the mint in London."

Brindley testified that he had to pay a customs charge at Heathrow and another customs charge at Gatwick. When asked why they could not pay the final fee by taking it out of the consignment, Brindley stated: "They couldn't do that. At least as it was explained to me from the beginning, under the rules we couldn't take any money out of this thing until we are totally done, and then I could have it wire-transferred out. From the beginning, not just there at this 125-."

Brindley testified that he has not notified anyone about the Investment being a scam, and he stated: "I believe it's real. I haven't notified anybody." Brindley admitted that he has not fulfilled the promises made in the memos to provide money or return money if the transaction did not close. He stated: "I notified Arnold each time when I was there each of these instances because of the reason that wasn't being paid."

Brindley testified that he held power of attorney for Bonaparte. Brindley stated that he had to get a new power of attorney three times because they were "only written for one year at a time." When asked who prepared the power of attorney, Brindley stated: "The government the county is from and signed off by whatever the department is there that signed it off and shows the payment was made and gives me the full power of attorney." The original power of attorney cost 18,000 pounds and the renewals were 12,000 each.

When asked why he dealt so much in cash, Brindley stated: "I was told that was the only way we could handle this and make the payments, that it had to be in cash." When asked if he had any receipts, he stated: "I have some receipts, a couple of them, and Tony Woods has the bulk of them."

Ralph Kelly Lambert ("Kelly Lambert"), Lambert's son, testified that in March of 2013 he met with Fitzgerald in Fitzgerald's office along with his father and mother. There he was told about an investment that his father was involved with. He stated:

> That there was cash in London. . . . Cash, containers of cash in a rather large amount. I can't remember the exact amount. I remember something about the money had been cleaned, was washed with some dye. They had spent money to get the dye off of this cash.

Kelly Lambert stated that Fitzgerald wanted him to invest money for "a rather large return. It was quite a few times the initial investment." Kelly Lambert testified that he asked Fitzgerald to mail the details to his attorney, but Fitzgerald never did so. Kelly Lambert testified that his father had borrowed money from him previously to put into the Investment. He stated that his father borrowed around $62,000 total over a couple of occasions. Kelly Lambert was concerned about the Investment and he expressed this to his father and asked him to investigate further.

After trial, the Trial Court entered its Memorandum Opinion and Judgment on August 21, 2014 finding and holding, *inter alia*:

> At some point in 2008, Arnold Fitzgerald ("Defendant") started

35

"investing" in a plan promoted by Donald Brindley. The plan was based on representations that, somehow, Mr. Brindley would be able to acquire up to $150,000,000.00 in U.S. Currency. Supposedly, the money, consisting of six containers each containing $25,000,000.00 in one hundred dollar bills, had been shipped from South Africa to London, England. Mr. Brindley was to become qualified as a "diplomat" and obtain a power of attorney from the alleged owner of the currency, a certain Ebenezer Bonaparte, who sounds like a character from a Dickens novel. When Mr. Brindley obtained the diplomatic status and power of attorney and, after the money had been cleaned of a certain black ink or other substance which was on it, all or at least a large portion of the $150,000.000.00 [sic] would be turned over to Mr. Brindley. Mr. Fitzgerald later offered the Plaintiff, George Lambert, the opportunity to invest in this plan. After a substantial amount of time and a substantial amount of cash from Mr. Lambert, he sued Mr. Fitzgerald, claiming fraud and other charges. Mr. Lambert's claims against Mr. Fitzgerald were tried before this Court on August 6 and 7, 2014.[3]

* * *

**Testimony at Trial**

Mr. Fitzgerald testified that he was introduced to Donald Brindley through his relationship with two men named Mallory Horn and Sam Jones. At some point, Brindley contacted Fitzgerald in regard to the previously described plan to obtain the $150,000,000.00 in cash. According to Fitzgerald, he invested large sums of money with Brindley in regard to this plan. Fitzgerald said he had dealt with Brindley for the most part in cash. He testified he met Brindley at the Knoxville airport or [sic] at least two occasions and handed over large bags of cash. He also said he sent Andy Tucker, his nephew, to meet Brindley on several occasions delivering, again, large amounts of cash. No records were kept by Fitzgerald as to how much cash he handed over to Brindley or from whom the cash came. No receipts were received from Brindley. Brindley testified at trial that he had records but no one had asked him to bring them to court.

It was also proven at trial that Fitzgerald would write checks to different people on his attorney trust account, have the payee cash the check and return the cash to him. The cash would then be forwarded to Brindley. Mr. Lambert,

_____
[3] Mr. Fitzgerald has filed a third-party claim against Mr. Brindley which has been bifurcated for trial. Mr. Lambert has not filed a claim against Mr. Brindley.

the Plaintiff, became involved in 2009. Fitzgerald and Lambert had known each other for approximately forty years. Fitzgerald did legal work for Lambert and his companies and they both said they considered the other a friend. Fitzgerald claims that, while in his law office, Lambert saw some documents from Brindley on Fitzgerald's conference table. He said Lambert picked them up and said "I want in on this." Lambert disputes that and claims that Fitzgerald approached him about the "investment." In any case, on October 19, 2009, Fitzgerald signed a promissory note promising to pay Lambert $18,000.00 that Lambert advanced for this "investment." (Exhibit 1)

Later, based on memoranda from Brindley to Fitzgerald or to Lambert directly, Lambert forwarded, through Fitzgerald, large sums of cash to Brindley. Several memoranda from Brindley were introduced, in which he promised huge returns for the investments Lambert made. None of the promises of large returns had been kept on the date of trial. Apparently, neither has Fitzgerald received any money from Brindley.

Brindley testified at trial and said that the people in London with whom he was dealing kept demanding more and more for expenses to release the $150,000,000.00 and that those persons insisted that all payments be in cash.

In summary, the proof before the Court, after two days of trial was that the Defendant, Fitzgerald, had forwarded hundreds of thousands of dollars to Brindley in regard to this plan. Fitzgerald claimed he invested $517,000.00 of his own money, but had no records to backup or explain how he came to that conclusion. He had no way of knowing or determining how much he received from other persons or from Mr. Lambert. As noted, he supposedly met Brindley at airports and turned over sacks of cash with no receipts or knowledge of how much money he was turning over. He also sent Andy Tucker on numerous trips, including at least two to London, to deliver cash and obtain information. However, Fitzgerald produced no records of airline tickets, hotel receipts or anything else in regard to what he spent on these trips.

Mr. Lambert was able to document his "contributions" with more certainty and the evidence is fairly clear that he "invested" over $500,000.00 in this scheme through Fitzgerald.

**Plaintiff's Claims**

As noted earlier, the Plaintiff's complaint listed several claims. However, the claims can, for purposes of discussion and decision, be

37

consolidated into five;

1. securities act violations;
2. misrepresentations;
3. unjust enrichment;
4. professional negligence; and
5. undue influence.

### Securities Claims

The Tennessee Securities Act of 1980 ("The Act") regulates the sale and transfer of securities, as defined in The Act, in the State of Tennessee. The Act and the court decisions following it make clear that it is to be broadly and liberally construed to protect consumers. Mr. Lambert claims the plan to recover the $150,000,000.00 was a "security" as defined in The Act and that Mr. Fitzgerald was an investment adviser. One problem with this contention is that The Act itself specifically exempts currency from the definition of security. See T.C.A. § 48-l-102(17)(B). The aim of this plan was to secure legal possession of one hundred dollar bills in U.S. Currency. Mr. Lambert argues that he was investing in the plan to release the money to Brindley and not the cash itself. However, the statute seems pretty clear in its definition. Also, in King v. Pope. 91 SW3d 314 (Tenn. 2002), the Supreme Court clarified what constitutes an "investment contract" under The Act. In King, the Supreme Court adopted what is known as the "Hawaii Market" test to define invest [sic] contract. The Hawaii Market test has four factors which can be paraphrased as follows:

1. an offeree (Mr. Lambert) furnishes initial value (cash) to an offeror (Mr. Fitzgerald);
2. a portion of the initial value is subject to risk;
3. the offering of the initial value is induced by the offeror's promises or representations which caused the offeree to reasonably expect a return over and above the initial investment; and
4. offeree has no control of the management of the enterprise.

### Misrepresentation

Both intentional and negligent misrepresentation require that the Plaintiff has reasonably relied on the promises of the Defendant. The same is true, as shown above, under the Securities Act. At trial, Mr. Lambert's case was built on the premise that Mr. Fitzgerald must be committing fraud because

no one could believe the promises made by Mr. Brindley. This Court agrees. The promises of fantastic returns for the investments, the use of cash only, the consistent and long term failure to keep any promises made by Brindley and the very idea that someone named Ebenezer Bonaparte would, for unexplained reasons, ship $150,000,000.00 of literally dirty cash from South Africa to London and then agree to turn that over to Mr. Brindley all scream fraud. This Court cannot believe that Mr. Fitzgerald believed or continues to believe that the money even exists. It is more than suspicious that large sums of cash have allegedly been transferred to various parties to do legitimate business with no receipt or paper trail existing. Fitzgerald claims he believes the money still exists and that he will get at least $25,000.000.00 [sic] from this deal. This Court neither believes the money exists or that Fitzgerald believes that. The whole scheme is, for lack of a better term, crazy.

However, the same reasoning that applies to Fitzgerald applies also to George Lambert. During his business career, Mr. Lambert successfully ran several large businesses for several years. While, at the time of trial, he was ill and somewhat frail, there is no evidence that, at the time of his investments, he was in any way incompetent. At trial, Mr. Lambert testified and comprehended the questions asked of him. He answered those questions coherently and appropriately. He appeared perfectly competent. In addition, it was uncontradicted that two of Mr. Lambert's sons warned him that the deal made no sense. In fact, it was his son Kelly Lambert who insisted that Mr. Lambert see the lawyer who ended up filing this lawsuit. All of this is to say that this Court cannot find that Mr. Lambert was reasonable in his reliance on the representations made to him by Fitzgerald or Brindley. The craziness of the scheme was, or should have been, as evident to him as to anyone else. Therefore, Mr. Lambert has not proven one of the essential elements of his claims under the Securities Act or intentional and negligent misrepresentation, that element being reasonable reliance.

**Professional Negligence**

There is no evidence that Fitzgerald was acting as a lawyer for Mr. Lambert in this deal. No legal work or advice was rendered by Fitzgerald and no agreement for legal representation was produced. There is no basis for the claim of professional negligence.

**Confidential Relationships/Undue Influence**

Based on the same reasoning as the previous claim, the Court finds that

39

no confidential relationship existed between Lambert and Fitzgerald or that any undue influence was exerted by Fitzgerald on Lambert in this case.

### Unjust Enrichment

While there are plenty of questions about where Mr. Lambert's money is, he has not proven that Mr. Fitzgerald kept it or that he has been enriched by it. As noted previously, this Court has great suspicions about what happened in this case. However, this Court is not allowed to act on suspicions and can only rule based on evidence and law. Mr. Lambert has not proven unjust enrichment on the part of Mr. Fitzgerald.

### Punitive Damages

Without finding evidence to support any of the tort claims, this Court cannot consider punitive damages.

### Breach of Contract

It is clear and, in fact, is admitted by all Fitzgerald owes George Lambert is [sic] $18,000.00 under the promissory note signed on October 19, 2009. That note became due on July 1, 2010. The note provides for zero percent interest but does provide for attorney's fees and costs. Therefore, the Court issues judgment to George Lambert and against Arnold Fitzgerald in the sum of $18,000.00 in principal plus $6,000.00 in attorney's fees for prosecution of that claim.

Therefore, it is Ordered that:

1. judgment issued on behalf of George Lambert and against Arnold Fitzgerald in the amount of $24,000.00, consisting of $18,000.00 in principal and $6,000.00 in attorney's fees under the promissory note;
2. all other claims raised by George Lambert in this lawsuit against Arnold Fitzgerald are **Dismissed** with prejudice.

(footnote in original but renumbered.)

Lambert died within days of entry of the Trial Court's August 21, 2014 order. The Trial Court entered an order substituting the Estate of George Lambert ("the Estate") as the plaintiff in this case. Kelly Lambert is the executor of the Estate. The Estate filed a motion to alter or amend. By order entered October 7, 2014 the Trial Court, *inter alia*,

awarded the Estate pre-judgment interest and further attorney's fees on the promissory note for a total award of $33,840.28, reserved the issue of contempt, and denied the Estate's remaining claims. On May 4, 2015, the Trial Court entered an order finding Fitzgerald in contempt of court for violating the restraining order by wiring money to Brindley on August 15, 2013 and again on September 17, 2013. The May 4, 2015 order fined Fitzgerald $50 for each violation and sentenced him to ten days in jail for each violation suspended on good behavior. The Trial Court certified its May 4, 2015 order as final pursuant to Tenn. R. Civ. P. 54.02. The Estate appeals the Trial Court's August 21, 2013 order to this Court.

## Discussion

Although not stated exactly as such, the Estate raises three issues on appeal: 1) whether the Trial Court erred in dismissing the claims for fraud and intentional misrepresentation; 2) whether the Trial Court erred in dismissing the claim for violation of the Tennessee Securities Act of 1980; and, 3) whether the Trial Court erred in dismissing the claim for unjust enrichment.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in dismissing the claims for fraud and intentional misrepresentation. As our Supreme Court has instructed:

> Our current common-law claim for intentional misrepresentation is the successor to the common-law action for deceit. *First Nat'l Bank of Louisville v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). In fact, "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999). In this opinion, we will refer to the cause of action as a claim for intentional misrepresentation, and, in order to avoid confusion, we suggest that this term should be used exclusively henceforth. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012) (noting that "intentional infliction of emotional distress" and "outrageous conduct" were different names for the same tort and stating that the tort should be referred to as "intentional infliction of emotional distress").

41

To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation. *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d at 311 (quoting *Metropolitan Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)); *see also* 8 Tennessee Practice: Tennessee Pattern Jury Instructions—Civil § 8.36, at 357 (11th ed. 2011).

Adopting the Restatement (Second) of Torts § 549 (1977), this Court has held that the proper measure of damages for an intentional misrepresentation claim is:

(1) The recipient of [an intentional] misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in [the] transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
(2) The recipient of [an intentional] misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

*Boling v. Tennessee State Bank*, 890 S.W.2d 32, 35–36 (Tenn. 1994) (quoting Restatement (Second) of Torts § 549 (1977)).

*Hodge v. Craig*, 382 S.W.3d 325, 342-43 (Tenn. 2012) (footnotes omitted).

With regard to this issue the Trial Court specifically found and held, *inter alia*:

Mr. Lambert's case was built on the premise that Mr. Fitzgerald must be committing fraud because no one could believe the promises made by Mr.

42

Brindley. This Court agrees. The promises of fantastic returns for the investments, the use of cash only, the consistent and long term failure to keep any promises made by Brindley and the very idea that someone named Ebenezer Bonaparte would, for unexplained reasons, ship $150,000,000.00 of literally dirty cash from South Africa to London and then agree to turn that over to Mr. Brindley all scream fraud. This Court cannot believe that Mr. Fitzgerald believed or continues to believe that the money even exists. It is more than suspicious that large sums of cash have allegedly been transferred to various parties to do legitimate business with no receipt or paper trail existing. Fitzgerald claims he believes the money still exists and that he will get at least $25,000.000.00 [sic] from this deal. This Court neither believes the money exists or that Fitzgerald believes that. The whole scheme is, for lack of a better term, crazy.

However, the same reasoning that applies to Fitzgerald applies also to George Lambert. During his business career, Mr. Lambert successfully ran several large businesses for several years. While, at the time of trial, he was ill and somewhat frail, there is no evidence that, at the time of his investments, he was in any way incompetent. At trial, Mr. Lambert testified and comprehended the questions asked of him. He answered those questions coherently and appropriately. He appeared perfectly competent. In addition, it was uncontradicted that two of Mr. Lambert's sons warned him that the deal made no sense. In fact, it was his son Kelly Lambert who insisted that Mr. Lambert see the lawyer who ended up filing this lawsuit. All of this is to say that this Court cannot find that Mr. Lambert was reasonable in his reliance on the representations made to him by Fitzgerald or Brindley. The craziness of the scheme was, or should have been, as evident to him as to anyone else. Therefore, Mr. Lambert has not proven one of the essential elements of his claims under the Securities Act or intentional and negligent misrepresentation, that element being reasonable reliance.

The evidence in the record on appeal as discussed fully above does not preponderate against the Trial Court's findings as to the issue of Lambert's reliance. Lambert's claimed reliance upon what Fitzgerald was telling him as to truly unbelievable guaranteed returns and numerous other bizarre "facts" as found by the Trial Court clearly was not reasonable, particularly after Brindley broke promise after promise after promise. Despite all this, Lambert continued to give Fitzgerald money for the Investment knowing that none of the outlandish promises made by Brindley had been kept. Such behavior in light of what Lambert knew could not be considered reasonable. The evidence does not preponderate against any of the Trial Court's findings relevant to this issue of reasonable reliance by Lambert, including the Trial Court's finding that the "craziness of the scheme

was, or should have been, as evident to [Lambert] as to anyone else." As such, Lambert failed to prove an essential element, reasonable reliance, of his claims for fraud and intentional misrepresentation. We find no error in the Trial Court's dismissal of the claims for fraud and intentional misrepresentation.

We next consider whether the Trial Court erred in dismissing the claim for violation of the Tennessee Securities Act of 1980. The Tennessee Securities Act of 1980 provides, in pertinent part, that: "It is unlawful for any person to sell any security in this state unless [specific conditions are met] . . . ." Tenn. Code Ann. § 48-1-104(a) (2012). The Tennessee Securities Act of 1980 further provides that: "'Security' does not include: (i) Currency; . . . ." Tenn. Code Ann. § 48-1-102(17)(B) (2012). The Investment involved exchanging cash in return for ostensibly obtaining a portion of the cash, or currency, purportedly contained in containers located somewhere in England. As such, pursuant to the plain language of Tenn. Code Ann. § 48-1-102(17)(B), the Investment was excluded from the registration requirements of the Tennessee Securities Act of 1980.

The Estate argues in its brief on appeal that the Investment should be considered an investment contract, which would be subject to the Tennessee Securities Act of 1980. In *King v. Pope*, our Supreme Court adopted a test to determine whether an investment contract exists stating:

Under this test, an investment contract exists where

(1) An offeree furnishes initial value to an offeror, and (2) a portion of this initial value is subjected to the risks of the enterprise, and (3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and (4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

*King v. Pope*, 91 S.W.3d 314, 316 (Tenn. 2002) (citations omitted).

The Trial Court found that the test set out in *King v. Pope*, contains an element of reasonable reliance. We agree. The third prong of the test states that the furnishing had to be induced by promises or representations "which give rise to a reasonable understanding that a valuable benefit . . . will accrue . . . ." *Id.* As discussed more fully above in connection with our analysis regarding the claims for fraud and

misrepresentation, the absurd promises and representations made to Lambert could not give rise to such a "reasonable understanding." *Id.* As already discussed, it was not reasonable for Lambert to have relied upon those promises or representations. As such, we find no error in the Trial Court's decision that the Tennessee Securities Act of 1980 was not applicable to the Investment.

Finally, we consider whether the Trial Court erred in dismissing the claim for unjust enrichment. As our Supreme Court has explained:

> The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust.

*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citations omitted).

Fitzgerald testified that he invested $517,000 of his own money in the Investment. Brindley testified that he received from Fitzgerald approximately $517,000. Crediting this testimony as to this claim, or in other words, accepting Fitzgerald's and Brindley's testimony as true for purposes of this claim, the evidence shows that Brindley received all of the money Fitzgerald claimed he invested, and only the $517,000 that Fitzgerald claimed he invested of his own money. Given this, the money that Lambert gave to Fitzgerald to give to Brindley for the Investment is unaccounted for as it never reached Brindley from Fitzgerald.

Fitzgerald admitted that he received money from Lambert on many occasions and documentary evidence introduced at trial supports this assertion. Although Fitzgerald also asserted that he gave all of the money given to him by Lambert to Brindley, the evidence in the record on appeal does not support this assertion. Brindley's testimony establishes that he received from Fitzgerald only an amount that is approximately equal to the amount of Fitzgerald's own money that Fitzgerald claimed to have sent to Brindley. The conclusion to be drawn from Fitzgerald's own testimony is that Fitzgerald did something else, other than giving it to Brindley, with the money given to him by Lambert. As such, Lambert proved that he conferred a benefit on Fitzgerald that Fitzgerald appreciated, and it would be inequitable for Fitzgerald to continue to retain the benefit. The preponderance of the evidence in the record on appeal supports a finding that Fitzgerald was unjustly enriched by Lambert

The evidence in the record on appeal shows that Lambert gave hundreds of thousands of dollars to Fitzgerald to pass on to Brindley. The exhibit produced documenting Lambert's claimed losses showed a total loss of $699,567.24.[4] These documented losses, however, included $18,000 under the promissory note, which Lambert received a judgment for, and a $125,000 loss for the sale of real property that Lambert claimed to have sold at a loss. As Lambert already has received a judgment under the promissory note, and Fitzgerald did not receive the benefit of the $125,000 claimed loss on the sale of the real property, these items are not properly included in the calculation of the award for unjust enrichment. We find and hold that Lambert proved unjust enrichment and is entitled to a judgment against Fitzgerald in the additional amount of $556,567.24 for unjust enrichment.

## Conclusion

The judgment of the Trial Court is reversed, in part, as to the claim of unjust enrichment, and this cause is remanded to the Trial Court for entry of a judgment awarding to Lambert from Fitzgerald the additional amount of $556,567.24 for unjust enrichment. The remainder of the judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for entry of the judgment pursuant to this Opinion, and for collection of the costs below. The costs on appeal are assessed against the appellee, John Arnold Fitzgerald.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[4] The exhibit contains a mathematical error in the calculation. It states the total amount to be $699,567.54. The correct amount, however, as supported by the other evidence introduced at trial, is $699,567.24.